UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

LAN NGUYEN,

      Plaintiffs,

v.                                          Case No. 05-00019

GENERAL M0TORS CORP. and DONALD      Honorable Nancy G. Edmunds
LEE,

      Defendants.

_____/

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT GENERAL MOTORS CORPORATION'S  MOTION FOR SUMMARY JUDGMENT [43]

Plaintiff Lan Nguyen has filed claims against Defendant General Motors[1] under Title VII of the Civil Rights Act of 1964 ("Title VII") and the Michigan Elliot-Larsen Civil Rights Act ("ELRCA"), pursuing theories of quid pro quo sexual harassment, hostile work environment sexual harassment, and retaliation.  Plaintiff also pursues common law claims of intention infliction of emotional distress, negligent infliction of emotional distress, and negligence.  Defendant has moved for summary judgment on all counts.[2]

For the following reasons, Defendant's Motion for Summary Judgment is GRANTED as to all claims except Plaintiff's quid pro quo sexual harassment claims under Title VII and the ELRCA.  Defendant's Motion is DENIED as to those two claims.

---

[1]Donald Lee, a General Motors supervisor, is also a defendant in this lawsuit.  This Order concerns only Plaintiff's claims against General Motors.

[2]Plaintiff initially claimed a violation of the Bullard-Plawecki Right to Know Act as well.  In her Answer to Defendant's Motion for Summary Judgment, Plaintiff abandoned her claim under the Right to Know Act.

I.    **Facts**

Plaintiff is a Vietnamese-American employed by Defendant since 1984.  She began her employment at the Lansing Car Assembly Plant, and worked there during the events giving rise to this litigation.  (Pl.'s Dep. 33-35.)[3]  Her employment was continuous with the exception of one layoff, when she worked as a seamstress.  (*Id.* at 33.)  Plaintiff has always been an hourly employee represented by the UAW.  (*Id.* at 34.)

Donald Lee, an African-American, is a production supervisor at the Lansing Car Assembly Plant with twenty-five years of experience.  (Gaunt Dep. 115.)  Plaintiff first met Mr. Lee around 1997 or 1998.  (Pl.'s Dep. 36.)   Mr. Lee was never Plaintiff's direct supervisor, but would fill in as her supervisor as needed.  (*Id.*)  Plaintiff claims that Mr. Lee began filling in as her supervisor "six or seven years ago."  (*Id.* at 37.)

Plaintiff alleges that Mr. Lee has made a number of sexually inappropriate comments to her, including:

- "Mmmm, mmmm, mmmm"
- "[O]nce I go to black I will never come back to white"
- "[B]lack folks have big cock"
- "I look good to eat"
- "[H]e can think a lot of things to do with me"
- "[I]f I was his girlfriend he would want sex once a day"
- "[H]e can strip me naked with his eyes"
- "[I]f I listened to him my life at [work] would be a lot easier"

(*Id.* at 38-39.)  Additionally, Plaintiff claims that Mr. Lee asked her for dates, frequently requested rides home, and kissed her without permission during one such ride.  (*Id.* at 40-42.)  After that incident, Plaintiff did not give rides to Mr. Lee, sometimes lying to avoid

---

[3]Plaintiff refers to the plant as "Fisher Body Plant" in her deposition.  At the end of 1984, the Fisher Body Plant was renamed the Buick-Oldsmobile-Cadillac Lansing Car Assembly Body Plant.

having to do so.  (*Id.* at 42.)  Mr. Lee also gave Plaintiff a ride home on one occasion.  (*Id.* at 42-43.)  Despite the ongoing nature of Mr. Lee's conduct, Plaintiff states that she did not alert Defendant's management of the problem.  (*Id.* at 71, 84.)

On September 5, 2002, Mr. Lee was acting as Plaintiff's supervisor.  (Pl.'s Dep. 95.)  According to Plaintiff, Mr. Lee passed by her work station several times that day, once leaving his phone number and twice asking her for a date.  Plaintiff rejected Mr. Lee's invitation and threw away his phone number, to which Mr. Lee replied, "You fucking turn me down all the time."  (*Id.* at 97-99.)  Plaintiff claims that after Mr. Lee said this, she "knew something was going to happen to me."  (*Id.*)

Mr. Lee then said that Plaintiff "fucked up" by affixing the wrong lock rods to the vehicles she was working on.  (*Id.*)  He relieved Plaintiff from the assembly line to meet in his office.  (*Id.* at 103.)  When Plaintiff was seated on a picnic table outside Mr. Lee's office, he accused her of damaging General Motors property.  (*Id.* at 104.)  Mr. Lee then left, perhaps to find Plaintiff's committeeman.  The break whistle blew during his absence and another hourly employee suggested to Plaintiff that she could still take her break.  Plaintiff went to the restroom.  (*Id.* at 106.)  While she was gone, Mr. Lee returned.  He then suspended Plaintiff for eight days, including three days for careless work and five days for leaving her work area without permission.  (Def.'s Mot. Summ. J. Ex. 5; Pl.'s Answer Ex. 11 p. 190.)  At the advice of the union committeeman, Plaintiff did not sign her disciplinary papers, but returned home. (*Id.* at 109.)  While at home on suspension, Mr. Lee called Plaintiff at least twice.  Plaintiff did not speak to him, but saw his name and number on her caller-ID system. (*Id.* at 111-12.)

Plaintiff first brought the alleged sexual harassment to the attention of her committeeman at her disciplinary hearing. (*Id.* at 117.)  She had never previously informed Defendant of Mr. Lee's actions.  (*Id.* at 64; 71; 84).  Ms. Louretta Hart was assigned to investigate the claims.  Ms. Hart had several phone conversations with Plaintiff, as well as a visit to Plaintiff's home to check the caller-ID system.  After her initial investigation, Ms. Hart concluded that Plaintiff was "extremely upset and fearful of Mr. Lee," that Plaintiff should have been disciplined, but her discipline was excessive, and that Mr. Lee "does not appear to take GM's code of conduct seriously . . . and . . . continues to put his employer in jeopardy with these personal relationships." (Pl.'s Answer Ex. 1 p. 198.)

Plaintiff also gave Ms. Hart names of several co-workers who have had contact with Mr. Lee, and Ms. Hart interviewed them.  Two female workers claim that Mr. Lee had never sexually harassed them, though he did ask one of them on a date once.  (*Id.* at 204.)  A male worker, Derrick Peyton, recalled a 1994 incident in which a woman claimed Mr. Lee grabbed her rear end, but he could not remember the outcome.  (*Id.*)

On October 31, 2002, Plaintiff met with her union representative and a General Motors personnel representative.  She was assured that her job was not in jeopardy and that she could bring any future problems to management's attention.  (Pl.'s Dep. 145-46.)  Defendant erased the disciplinary action from Plaintiff's record and paid her in full for the days she had been suspended.  (*Id.* at 150.)  Defendant demoted Mr. Lee one level, revoked his "merit dollars" for 2002, required him to take further sexual harassment

training, and transferred him to the Orion facility.  (Gaunt Dep. 115.)  Plaintiff requested a transfer to the Chassis Plant, which was granted.[4]

## II.  Standard of Review

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The mere existence of a scintilla of evidence in support of the non-moving party's position

---

[4]Plaintiff is currently laid off.  Plaintiff admits she was part of a mass-layoff and was not singled out as a result of her claim.  (Pl.'s Dep. 148-49.)

will not suffice.  Rather, there must be evidence on which the jury could reasonably find for the non-moving party.  *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

### III.   Discussion

#### A.  Title VII

Plaintiff has asserted claims of quid pro quo and hostile environment sexual harassment, as well as wrongful retaliation, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.*  Plaintiff's quid pro quo and hostile environment sexual harassment claims stem from the treatment she received from Mr. Lee.  She does not argue that Defendant itself has harassed her, but that Defendant should be held vicariously liable for Mr. Lee's conduct.

In *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), the United States Supreme Court clarified the circumstances under which Defendant may be held vicariously liable under substantive sexual harassment claims under Title VII.  The Sixth Circuit has distilled the law from these cases as follows:

> An employer's liability for supervisory sexual harassment depends on the consequences of the supervisor's actions.  If proven sexual harassment by the supervisor did not result in a tangible employment action, then the employer may not be liable if it engaged in preventative or corrective measures and the plaintiff unreasonably failed to utilize the measures the employer provided.  *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765.  If the sexual harassment did result in a tangible employment action, the employer will be strictly liable for the supervisor's sexual harassment.  *Ellerth*, 524 U.S. at 762-63.  "When a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII."  *Ellerth*, 524 U.S. at 753-54.

*Keeton v. Flying J, Inc.*, 429 F.3d 259, 262-263 (6th Cir. 2005).

6

Thus, as to Plaintiff's substantive Title VII claims, the terms quid pro quo and hostile environment are of relatively little importance.  This Court must instead focus on whether Plaintiff's eight-day suspension constituted a tangible employment action sufficient to impose strict liability against Defendant, and if not, whether Defendant was reasonable in its efforts to prevent or correct the harassment and Plaintiff was unreasonably in her failure to take advantage of these measures.

### 1.  Tangible Employment Action

Plaintiff first argues that her eight-day suspension constituted a tangible employment action[5] sufficient to impose vicarious liability upon Defendant under a quid pro quo theory, i.e., that Mr. Lee's decision to suspend her was motivated at least in part by her rejection of his sexual advances.[6]  Defendant contends that because it has remedied Plaintiff's eight-day suspension, Plaintiff has suffered no tangible employment action.  Defendant further contends that the eight-day suspension is irrelevant, since it was not related to Mr. Lee's sexual harassment of Plaintiff.

Until recently, the Sixth Circuit adhered to an *ultimate* employment action standard, whereby only a final decision such as hiring or firing could constitute a tangible employment action.  The court laid out this standard in *Dobbs-Weinstein v. Vanderbilt University*, 185 F.3d 542 (6th Cir. 1999), in which the plaintiff alleged that she had been denied tenure in

---

[5]The terms "tangible employment action," "adverse employment action," and "tangible job detriment," as well as a few similar variations, are used interchangeably by different courts.  *See White v. Burlington Northern & Santa Fe Ry.*, 364 F.3d 789, 796 n.1 (6th Cir. 2004).

[6]Although these elements appear somewhat outdated given the Supreme Court's decisions in *Ellerth* and *Faragher*, the Sixth Circuit has continued to employ them.

violation of Title VII.  The Sixth Circuit found that the plaintiff could not rely on the denial of

tenure, since the defendant later rehired her into a tenured position and provided back-pay

for the time she had been off work.  The court held that only an "ultimate employment

decision" could provide the basis for an adverse employment action under Title VII.  *Id.* at

545-46.

In *White v. Burlington Northern & Santa Fe Ry.*, 364 F.3d 789 (6th Cir. 2004),

however, the Sixth Circuit reversed its holding in *Dobbs-Weinstein*[7] and "join[ed] the

majority of other circuits in rejecting the 'ultimate employment decision' standard."  *Id.* at

801-02.  Instead, the court held that a tangible employment action is simply a "materially

adverse change in the terms and conditions of . . . employment."  *Id.* at 795 (quoting *Hollins*

*v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir. 1999)).  The court found that the plaintiff's

suspension without pay for thirty-seven days constituted tangible employment action,

despite the fact that the defendant later reinstated her with back-pay.  *Id.* at 794.[8]

---

[7]Despite reversing itself, the court left open the possibility that the outcome in *Dobbs-Weinstein* would remain the same, given that it "was based in part upon the unique nature of 'tenure decisions in an academic setting.'"  *White*, 364 F.3d at 802 n.7 (quoting *Dobbs-Weinstein*, 185 F.3d at 545).

[8]The United States Supreme Court affirmed the Sixth Circuit's decision in *White*, albeit based on different reasoning.  The Supreme Court first held that Title VII's anti-discrimination provision and its anti-retaliation provision implicate two different standards:

> Title VII's substantive provision and its anti-retaliation provision are not coterminous.  The scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm.  We therefore reject the standards applied in the Courts of Appeals that have treated the anti-retaliation provision as forbidding the same conduct prohibited by the anti-discrimination provision and that have limited actionable retaliation to so-called "ultimate employment decisions."

*Burlington Northern v. White*, — U.S. —; 126 S.Ct. 2405, 2414 (2006).  Under the anti-

The Sixth Circuit's decision in *White* provides compelling authority for Plaintiff's position here.  While the Court recognizes that an eight-day suspension places less financial hardship on an employee than a thirty-seven day suspension, the Court is not prepared to rule as a matter of law that it was a mere inconvenience.  For many people, a prolonged delay in receiving eight days worth of pay can cause serious economic hardship. In fact, the Sixth Circuit in *White* relied upon a Second Circuit case holding that despite reimbursement, a suspension without pay for one week met the tangible employment action standard "because the employee 'suffered the loss of the use of her wages for a time.'" *Id.* at 802 (quoting *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223-24 (2d Cir. 2001)).

Plaintiff's suspension was not a "trivial employment action[]," *id.* at 799, causing a "mere inconvenience" or "bruised ego."   *Id.* at 797 (quoting *Kocsis v. Multi-Care Management Inc.*, 97 F.3d 876, 886 (6th Cir. 1996)).  Based on Sixth Circuit precedent, therefore, Plaintiff's suspension meets the tangible employment action element.

Defendant argues that Plaintiff's suspension was unrelated to Mr. Lee's sexual harassment, and instead was a reasonable response to her admitted violation of shop

---

retaliation provision at issue in the case, the Court explained that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Id.* at 2415 (quotations and citations omitted).  The Court concluded that under this test, the plaintiff's 37-day suspension without pay was sufficiently serious to support her claim, despite her employer's having reinstated her with back-pay.

Because the Supreme Court's decision in *White* applies only to Title VII's anti-retaliation provision, it only alters the Sixth Circuit's ruling as to that specific issue; the Sixth Circuit's revised definition of "adverse employment action" remains applicable to Title VII's substantive provisions, and thus applies here.

9

rules.   As the factual record discussed above indicates, however, there is sufficient evidence to support a reasonable jury verdict to the contrary.   Plaintiff states that Mr. Lee gave her a note with his phone number, and then asked her twice if she would go out with him.  When Plaintiff declined, and then threw away his phone number, Mr. Lee said, "You fucking turn me down all the time."  Plaintiff says that she "knew something was going to happen to [her] then."   A short while later, Mr. Lee suspended Plaintiff for eight days, a punishment that Defendant's own investigator determined to be overly harsh.  A question of fact remains as to this issue.

In sum, because Mr. Lee's eight-day suspension of Plaintiff constituted a tangible employment action, Defendant will be held strictly liable for his sexual harassment of Plaintiff.  Of Course, Plaintiff must still prove that the harassment occurred, and must establish a connection between the harassment and her suspension.

### 2.  Prevention and Correction of Harassment

Because there remains a question of fact as to whether Plaintiff's suspension was related to Mr. Lee's sexual harassment, Plaintiff wishes to establish Defendant's liability even absent a tangible employment action.  Thus, in addition to her quid pro quo theory, Plaintiff pursues a hostile work environment theory.

For Plaintiff to prevail absent a connection between the tangible employment action and the sexual harassment, the harassment must be "severe or pervasive."  *Ellerth*, 524 U.S. at 753-54.  A hostile work environment exists "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quotations and citations omitted).  The

10

Court must consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Id.* at 23.   Unless extremely serious, isolated incidents will not suffice.  *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 790 (6th Cir. 2000).

Defendant argues that it has established the affirmative defense to hostile environment claims as laid out in *Ellerth* and *Faragher*, i.e., that even if Plaintiff was subject to severe or pervasive sexual harassment, Defendant engaged in reasonable preventative or corrective measures and Plaintiff unreasonably failed to avail herself of these measures. *Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807.

Defendant has presented evidence that both Plaintiff and Mr. Lee were aware of its policies regarding sexual harassment and that they both had completed the requisite training.  As discussed above, Defendant did not have knowledge of the harassment until after the September 5 incident, and upon learning of the situation, Defendant acted promptly and extensively to remedy the problem.  Furthermore, Plaintiff testifies that she did not utilize the grievance procedures available, although she knew of them.  If Mr. Lee's harassment was sufficiently pervasive as to create a hostile work environment, then it was necessarily going on prior to the September 5 incident.  Plaintiff had a responsibility to alert Defendant of the problem as it arose--thus enabling Defendant to take corrective action-- rather than waiting until after she had been suspended.

It is abundantly clear that Defendant acted reasonably to prevent and correct the sexual harassment, and that Plaintiff was unreasonable in her failure to avail herself of Defendant's help.  Therefore, Plaintiff has failed to raise a genuine issue of material fact,

11

and summary judgment is appropriate as to Plaintiff's hostile work environment claim under Title VII.

### 3. Retaliation

To establish a prima facie case of retaliation under Title VII, Plaintiff must show: 1) that she engaged in activity that Title VII protects; 2) that Defendant knew that she engaged in the protected activity; 3) that Defendant effected a tangible employment action against her; and 4) there is a causal connection between the protected activity and the tangible employment action. *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003).

Because Plaintiff complained of Mr. Lee's harassment *after* she was suspended from work, her retaliation claim is misplaced. The protected activity here is Plaintiff's complaint of harassment. Rather than retaliate against Plaintiff, Defendant responded favorably to Plaintiff. Summary judgment is therefore appropriate for Plaintiff's retaliation claim under Title VII.

### B. Elliot-Larsen Civil Rights Act Claims

Plaintiff has also asserted claims under the ELCRA, Mich.Comp. Laws § 37.2101 *et. seq.*, which provides protection from sexual harassment. The statutory definition of sexual harassment reads as follows:

> Sexual harassment means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature under the following conditions:
>
> (i)  Submission to the conduct or communication is made a term or condition either explicitly or implicitly to obtain employment . . .
>
> (ii)  Submission to or rejection of the conduct or communication by an individual is used as a factor in decisions affecting the individual's employment . . .

12

(iii) The conduct or communication has the purpose or effect of substantially interfering with an individual's employment . . . or creating an intimidating, hostile, or offensive employment . . . environment.

*Id.* at § 37.2103(i).  The Michigan Supreme Court has labeled harassment falling under the first two prongs as "quid pro quo" harassment and that falling under the third prong as "hostile environment" harassment.  *Chambers v. Trettco, Inc.*, 614 N.W.2d 910, 915 (Mich. 2000).

### 1.  Quid Pro Quo

The Michigan Supreme Court has provided the following elements of a claim of quid pro quo harassment:

[A]n employee must, by a preponderance of the evidence, demonstrate:

(1) that she was subject to any of the types of unwelcome sexual conduct or communication described in the statute, and

(2) that her employer or the employer's agent used her submission to or rejection of the proscribed conduct as a factor in a decision affecting her employment.

*Chambers,* 614 N.W.2d at 915.  "[Q]uid pro quo harassment occurs only where an individual is in a position to offer tangible job benefits in exchange for sexual favors or, alternatively, threaten job injury for a failure to submit.  That individual is most often a person with supervisory powers."  *Champion v. Nationwide Sec., Inc.*, 545 N.W.2d 596, 601 (Mich. 1996).  Employers are subject to strict liability on quid pro quo claims, as "[a]llowing employers to hide behind a veil of individual employee action will do little, if anything, to eradicate discrimination in the workplace."  *Id.*

It is clear from the record that Plaintiff was subject to unwelcome sexual contact from Mr. Lee.  It is also clear that while Mr. Lee was not Plaintiff's everyday supervisor, he had

the authority to discipline her, and in fact exercised that authority.  Because this is a strict liability claim, Defendant would liable if Mr. Lee's actions constituted quid pro quo harassment.

Defendant makes the same two arguments here as it raises against Plaintiff's Title VII quid pro quo claim.  First, Defendant points out that it provided back-pay for Plaintiff's eight-day suspension, arguing that "a rescinded employment action does not constitute an adverse employment action."  (Def.'s Mot. Summ. J. 12.)  In support of this argument, Defendant cites two unpublished[9] Michigan Court of Appeals cases, *Kupel v. General Motors Corp.*, 2003 Mich. App. LEXIS 1428 (Mich. Ct. App. June 17, 2003), and *Tsegaye v. Department of Corrections*, 2004 Mich. App. LEXIS 1009 (Mich. Ct. App. Apr. 20, 2004).  Both cases rely solely on *Dobbs-Weinstein*, in which the Sixth Circuit had held that only an "ultimate employment decision" could provide the basis for an adverse employment action under Title VII.  185 F.3d at 545-46.  As discussed above, however, the Sixth Circuit in *White* abandoned this standard, holding instead held that an "adverse employment action" standard only requires a showing of a "materially adverse change in the terms and conditions of . . . employment."  364 F.3d at 795 (quoting *Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir. 1999)).

This Court is aware of no Michigan cases addressing whether the Sixth Circuit's shift signals a parallel shift in Michigan law under the ELCRA.  But Michigan courts "are many times guided in [the] interpretation of the Michigan Civil Rights Act by federal court

---

[9]Defendant has not provided the Court with copies of the unpublished decisions, and has twice misidentified *Kupel v. General Motors Corp.*, once calling it *Kupel v. Multi-Care, Inc.*,  and once calling it *Capel v. Multi-Care, Inc.*

14

interpretations of its counterpart federal statute." *Chambers,* 614 N.W.2d at 917.  As the *Kupel* and *Tsegaye* cases suggest, this is true as to the adverse employment action element in particular.  Thus, it is likely that Michigan will follow the majority approach in abandoning the "ultimate employment decision" standard.  Because even a rescinded employment action can constitute an adverse employment action under the ELRCA, and Defendant's argument is rejected.

For reasons discussed in greater detail above, Plaintiff's eight-day suspension without pay was sufficiently serious to constitute "a decision affecting her employment," *Chambers,* 614 N.W.2d at 915, and therefore was an adverse employment action.

Defendant next contends that there was no causal connection between Plaintiff's rejection of Mr. Lee's advances and Mr. Lee's subsequent decision to discipline her.  As Plaintiff points out, however, and as is addressed more fully above, there is a genuine issue of material fact here.  The statute makes clear that Plaintiff must only show that her rejection was "*a* factor" in her discipline.  While she admits to violating shop rules, she has also presented evidence suggesting that Mr. Lee disciplined her solely, or more harshly than he otherwise would have, because of her opposition to his advances.  As a reasonable jury could conclude that her rejection of Mr. Lee was a factor in his subsequent decision to suspend her, Defendant's argument fails.

Because Plaintiff's suspension constituted an adverse employment action, and because a question of fact remains as to whether Plaintiff's rejection of Mr. Lee's sexual advances was "a factor" in his decision to suspend her, summary judgment is inappropriate as to Plaintiff's quid pro quo claim under the ELCRA.

**2.  Hostile Environment**

15

In *Radtke v. Everett*, 501 N.W.2d 155 (Mich. 1993), the Michigan Supreme Court provided a five-element prima facie case for a hostile environment sexual harassment claim under the ELCRA:

> (1) the employee belonged to a protected group;
>
> (2) the employee was subjected to communication or conduct on the basis of sex;
>
> (3) the employee was subjected to unwelcome sexual conduct or communication;
>
> (4) the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with the employee's employment or created an intimidating, hostile, or offensive work environment; and
>
> (5) respondeat superior.

*Id.* at 162. Unlike quid pro quo claims, hostile environment claims do not warrant the imposition of strict liability against an employer. Strict liability is "illogical" in a hostile environment case, as "the supervisor acts outside 'the scope of actual or apparent authority to hire, fire, discipline, or promote.'" *Radtke*, 501 N.W.2d at 169 n.46 (quoting *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1316 (11th Cir. 1989)).

An objective standard is applied to determine whether an employer had notice of the alleged harassment. Thus, "employer responsibility for sexual harassment can be established only if the employer had reasonable notice of the harassment and failed to take appropriate corrective action." *Elezovic v. Ford Motor Co.*, 697 N.W.2d 851, 861 (Mich. 2005). If, upon notice, the employer takes "prompt and appropriate remedial action," it will be absolved of liability. *Chambers*, 614 N.W.2d at 916. "The bottom line is that, in cases involving a hostile work environment claim, a plaintiff must show some fault on the part of the employer." *Id.*

16

Plaintiff concedes in her deposition that she never gave Defendant actual notice of the hostile environment until September of 2003. She contends, however, that Defendant reasonably should have known about the harassment. For example, Ms. Hart's investigation suggests that Mr. Lee was previously counseled regarding relationships with employees, that he was the subject of a prior complaint regarding sexual harassment, that he openly talked about sex, and that Plaintiff told three other workers about his actions.

This evidence is insufficient to raise a genuine issue of material fact regarding whether Defendant should have known of the harassment. First, while Defendant has apparently counseled Mr. Lee about dating employees, there is no indication that this had anything to do with harassment. Second, despite a co-worker's recollection, Mr. Lee's personnel file contains no evidence of past harassment. Third, there is no evidence that Defendant was aware of Mr. Lee's open discussions about sex. Finally, the fact that Plaintiff told three other hourly employees about the harassment was insufficient to put Defendant on notice. *See Elezovic*, 697 N.W.2d at 862 (plaintiff did not provide notice to her employer when she told two low-level supervisors of alleged sexual harassment).

Defendant did not have notice of Mr. Lee's inappropriate conduct until September of 2002, when it acted swiftly to rectify the problem. Defendant cleared Plaintiff's disciplinary record and compensated her for lost pay during her suspension.[10] It disciplined Mr. Lee by demoting him, taking away his merit dollars, transferring him to another facility, and requiring him to take sexual harassment training. Plaintiff has presented no evidence to challenge the adequacy of Defendant's response to Mr. Lee's behavior. Because

---

[10]As discussed above, this admirable decision does not absolve Defendant from quid pro quo liability.

Defendant did as much as one could expect, summary judgment is appropriate as to Plaintiff's hostile environment claim under the ELCRA.

### 3.  Retaliation

The ELCRA also protects employees from retaliation for filing sexual harassment (or other civil rights) claims.  The Act states that an employer may not "[r]etaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act."  Mich. Comp. Laws § 37.2701(a).

A prima facie case for retaliation requires the plaintiff to show "(1) that he engaged in a protected activity; (2) that this was known by the defendant; (3) that the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action."  *DeFlaviis v. Lord & Taylor, Inc.*, 566 N.W.2d 661, 663 (Mich. Ct. App. 1997).

The facts of this case do not support a retaliation claim.  There is no evidence that Plaintiff participated in any activity protected by § 37.2701(a), such as filing a grievance, before Mr. Lee disciplined her on September 5, 2002.  After Plaintiff participated in the protected activity of filing a grievance against Mr. Lee, there is no evidence of any adverse employment action toward Plaintiff.  On the contrary, Defendant took steps to remedy Mr. Lee's actions.  Because there is no evidence to support Plaintiff's retaliation claim, summary judgment is appropriate.

### C.  Intentional Infliction of Emotional Distress

18

Plaintiff claims that the words and actions of Mr. Lee support a claim of intentional infliction of emotional distress ("IIED"), and that Defendant is liable for this tort under a theory of respondeat superior.  Mr. Lee's conduct, however, was not so extreme and outrageous to sustain a cause of action for IIED.

The Michigan Supreme Court has not formally recognized the tort of IIED, but it has signaled a willingness to do so.  *See Roberts v. Auto-Owners Insurance Co.*, 374 N.W.2d 905, 913 (Mich. 1985) (Levin, J., concurring) ("the Court is prepared to look favorably on this 'modern tort'").[11]  The Michigan Court of Appeals has recognized IIED as an actionable claim, and provides the following elements of a prima facie case: "(1) 'extreme and outrageous' conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress." *Graham v. Ford*, 604 N.W.2d 713, 716 (Mich. Ct App. 1999).  The extreme and outrageous conduct must "go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Id.*  One example of conduct meeting this standard was a defendant's sending a barrage of threatening letters to the plaintiff and his family, leaving lingerie on the plaintiff's vehicle, leaving an ax and hatchet on the plaintiff's vehicles with threatening notes, telling people she wanted to "ice" the plaintiff, and threatening to move in with the plaintiff after he was married. *Haverbush v. Powelson*, 551 N.W.2d 206, 209 (Mich. Ct. App. 1996).

As Defendant points out, the Michigan Court of Appeals has found sexual comments "repulsive," but not so extreme or outrageous as to support an IIED claim.  *See Trudeau v. Fisher Body Div., General Motors Corp.*, 423 N.W.2d. 592, 594 (Mich. Ct. App. 1988).

---

[11]In *Roberts*, the Court held the facts in the case would not support a claim of IIED, and that it was unnecessary to recognize the tort.  374 N.W.2d at 912.

In *Trudeau*, the defendant's employee told the plaintiff, "I'm 40 years old and I've never screwed a white woman." *Id.* at 593.   In another case, an employee who left notes on the plaintiff's desk, kissed her, brushed up against her, and touched her knee was not found to have partaken in the extreme or outrageous conduct necessary for IIED.   *Selph v. Gottlieb's Fin. Serv.*, *Inc.*, 35 F. Supp.2d 564, 569 (W.D. Mich. 1999).

Here, Mr. Lee subjected Plaintiff to a series of repulsive sexual comments.  He also kissed Plaintiff.  Despite its inappropriateness, however, Mr. Lee's conduct was not so outrageous as to meet the very high standard under this tort.  The facts here are similar to those in *Trudeau* and *Selph*, both of which were too mild to support claims of IIED.  But they do not rise to the level of serious found in *Haverbush*.  Because Mr. Lee's conduct was not so extreme and outrageous to sustain a claim of IIED, summary judgment is appropriate.

### D.  Negligent Infliction of Emotional Distress and Negligence

Plaintiff claims that Mr. Lee's conduct also meets the standard for claims of negligent infliction of emotional distress ("NIED") and negligence.   Defendant counters that the Worker's Disability Compensation Act ("WDCA") provides the exclusive remedy for such claims.  *See* Mich. Comp. Laws § 418.131(1).

An exception to the exclusive remedy provision exists "only [in] cases which are based on a different relationship between the parties and in which it is clear that the employer-employee relationship between the parties is unrelated to the cause of action . . . ." *Jones v. General Motors Corp.*, 355 N.W.2d 646, 648 (Mich. Ct. App. 1984).  Because the allegations against Defendant stem solely from an employer-employee relationship, Plaintiff's remedy lies within the WDCA, and summary judgment is appropriate.

20

## IV.  CONCLUSION

Being fully advised in the premises, having read the pleadings, and for the reasons set forth above and on the record, the Court hereby GRANTS IN PART and DENIES IN PART Defendant's Motion for Summary Judgment.

Because genuine issues of material fact exist as to Plaintiff's quid pro quo claims under both Title VII and the ELRCA, Defendant's Motion is DENIED as to these two claims. As to all other claims, Defendant's Motion is GRANTED.


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  August 23, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record on August 23, 2006, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager

21